**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EMILY LEE, JAMIE HOAGLAND, ABBEY HOAGLAND** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 24-4180** |
| | : | |
| **COUNTY OF CHESTER, COUNTY OF MONROE, COATESVILLE AREA SCHOOL DISTRICT, NORTH BRANDYWINE MIDDLE SCHOOL, UPPER DUBLIN SCHOOL DISTRICT, HORACE S. SCOTT MIDDLE SCHOOL, ADELAIDE GRACE, EVE LARGE, DOUG WAEGEL, CATHERINE VAN VOOREN, TOMAS HANNA, KATHRYN LAMOTHE, STEVEN M. YANNI, and EUGENIA ROBERTS** | : : : : : : : : : : : : : : | |

## MEMORANDUM

**KEARNEY, J.**                                                          **August 13, 2025**

A father and his romantic partner are criminally charged in state court with starving, torturing, and abusing the father's twelve-year-old daughter Malinda over several years. Malinda, missing from her Chester County middle school for months, tragically died in May 2024 allegedly because her father and his romantic partner—a convicted child abuser—brutally abused her. They sit in jail today waiting for a trial in state court scheduled to begin next week on a series of charged crimes including murder, conspiracy, and endangering welfare of children.

Malinda's sisters now ask whether others could have stopped this tragedy. They focus on various child protective agencies and their directors, schools, teachers, and school officials. Malinda's sisters, individually and as co-administrators of Malinda's estate, allege these governmental agencies and schools turned a blind eye which allowed Malinda to live with her father and his child abuser partner, and their failure to intervene caused Malinda's abuse and

eventual death. The Sisters allege these state actors violated Malinda's substantive due process rights by not doing enough to remove Malinda from her abusive home. The Sisters also allege the local and school officials are liable for negligence. We granted the Sisters' request for leave to file a second amended Complaint after hearing oral argument. The Sisters timely amended. Monroe County filed an answer to the second amended Complaint confirming our continuing federal question jurisdiction. Three groups of Defendants with differing exposure to Malinda moved to dismiss: Chester County and two of its directors; Coatesville School District, two of its local schools, and multiple Coatesville administrators; and Upper Dublin School District and its Superintendent.

The Sisters present compelling prose about the atrocity of the harms to Malinda. But their rhetoric does not overcome the long-established law regarding a government's obligations to intervene in private conduct in the parental home. The Sisters do not and cannot after three attempts plead a substantive due process claim against Chester County and its Children, Youth & Families Directors Eve Large and Doug Waegel, Coatesville Area School District and its Superintendents Catherine Van Vooren and Tomas Hanna, North Brandywine Middle School and its Principal Eugenia Roberts, Horace S. Scott Middle School and its Principal Kathryn Lamothe, or Upper Dublin School District and its Superintendent Steven Yanni. We dismiss the federal claims against them with prejudice.

But, continuing to enjoy federal question jurisdiction over substantive due process claims against Monroe County, we exercise our discretion to retain supplemental jurisdiction over the Sisters' negligence claim on behalf of Malinda's estate based on alleged sexual abuse against Chester County and Directors Large and Waegel of Chester County Children, Youth & Families.

2

## I.    Alleged amended facts

Malinda Hoagland's father Rendell Hoagland met and began to date Cindy Warren in the fall of 2019.[1] Ms. Warren is, and was then, a convicted child abuser.[2] The Commonwealth criminally charged her in 2007 for abusing her 3-year-old son after a law enforcement investigation revealed Ms. Warren beat and starved him.[3] Ms. Warren also played a role in the death of a 2-year-old child in 2000.[4] Ms. Warren pleaded guilty to endangering welfare of children in 2007 and received a prison sentence with a maximum of seven years.[5]

Mr. Hoagland and Ms. Warren began living together in Monroe County, along with 8-year-old Malinda, shortly after they began dating.[6] Mr. Hoagland and Malinda's biological mother entered a custody agreement concerning Malinda at an unpleaded time.[7] The agreement stated in relevant part Malinda "shall not be left in the care of Cindy Warren, Father's fiancé, [sic] for any period of time exceeding one (1) hour unless expressly agreed upon by Mother and Father through written communication."[8] The Monroe County Office of Child and Youth and its director, Adelaide Grace, permitted Malinda to live in a household with her father and Ms. Warren despite knowing (according to the Sisters) Ms. Warren's status as a convicted child abuser.[9]

### *Malinda attends school in Upper Dublin School District.*

Malinda began attending school in Upper Dublin School District in August 2021.[10] Malinda exhibited signs of abuse such as bruising and emaciation throughout her time in Upper Dublin School District.[11] Upper Dublin School District and its Superintendent allegedly knew Mr. Hoagland and Ms. Warren abused Malinda and knew Ms. Warren was a child abuser with no custodial rights over Malinda.[12]

3

***Malinda moves from Upper Dublin with her father and Ms. Warren to Chester County.***

Malinda, Mr. Hoagland, and Ms. Warren moved to Chester County at an unpleaded time.[13] Chester County, Eve Large, and Doug Waegel—the directors of Chester County Children, Youth & Families—learned, at an unpleaded time, about the custody agreement between Malinda's parents because, the Sisters allege, they could have viewed the agreement on the official court docket and/or on their internal computer system.[14]

Malinda began attending King's Highway Elementary School (part of Coatesville Area School District) in April 2022.[15] Unpleaded persons at Coatesville Area School District received state-required documentation when Malinda enrolled at King's Highway and learned Malinda lived with Ms. Warren.[16] Unpleaded employees at Coatesville Area School District repeatedly released Malinda into Ms. Warren's care despite Ms. Warren's lack of legal custody over Malinda.[17] Coatesville Area School District Superintendents Catherine Van Vooren and Tomas Hanna "intentionally and callously ignored the documentation within their possession that Malinda Hoagland was under the supervision, control, and residence of Rendell Hoagland and Cindy Warren and affirmatively acted to release Malinda Hoagland into their custody, where she was tortured, abused, and subjected to egregious deeds, including but not limited to sexual abuse."[18]

***Malinda attends Scott Sixth Grade Center in Coatesville Area School District.***

Malinda began attending Scott Sixth Grade Center in Coatesville Area School District in the fall of 2022.[19] She routinely showed up to school hungry and emaciated.[20] Unpleaded employees including lunchroom personnel frequently provided Malinda with extra food.[21] Superintendent Van Vooren, Superintendent Hanna, and Kathryn Lamothe, the principal of Scott Sixth Grade Center, allegedly knew Malinda showed signs of malnutrition yet continued to release her to return home into the custody of her father and Ms. Warren.[22]

4

***Malinda attends North Brandywine Middle School in Coatesville Area School District.***

Malinda started attending North Brandywine Middle School in Coatesville Area School District sometime in 2023.[23] Malinda accumulated twenty-five unexcused absences and ten excused absences during her time at North Brandywine Middle School.[24] No one provided the school with documents to support Malinda's absences.[25] Unpleaded persons working for North Brandywine and/or the school district repeatedly documented Malinda's absences as "illegal absence[s]."[26] Principal Lamothe sent two letters to Malinda's father in April 2023 concerning Malinda's unexcused absences.[27] Both of the letters underrepresented the number of times Malinda had missed school in the winter of 2023; according to the Sisters, Malinda missed seventeen days from January through March.[28] No one in the school district ever notified a magisterial district judge of Malinda's truancy as required by state truancy laws.[29]

Ms. Warren picked Malinda up from North Brandywine Middle School on numerous occasions.[30] No staff member ever confirmed Ms. Warren's identity or checked whether she had custodial rights to take Malinda from school.[31]

***Chester County Children, Youth & Families receive several reports about Malinda.***

An unpleaded person reported concerns about Malinda to Chester County Children, Youth & Families on June 1, 2023 through ChildLine.[32] Eve Large and Doug Waegel, the directors of Chester County Children, Youth & Families, learned Malinda had a bruise below her left eye (and when asked about the bruise, Malinda offered multiple different explanations); Malinda seemed "down"; and earlier in the year, Malinda arrived at school with an abrasion on her face which neither her father nor Ms. Warren could explain.[33] The day after receiving this report, an employee from Chester County Children, Youth & Families called Ms. Warren and spoke with her directly.[34] The employee learned during the call Malinda had multiple unexplained bruises on her body.[35]

5

After learning Ms. Warren's identity on June 2, 2023, Chester County Children, Youth & Families (as well as Directors Large and Waegel) allegedly knew Malinda lived with a convicted child abuser in violation of her parents' custody agreement.[36] No one from the Children, Youth & Families office visited Malinda's home to assess her living environment.[37]

Malinda returned to North Brandywine Middle School for the 2023–24 school year in fall 2023. She showed up to school picture day on October 26, 2023 with more bruising around her left eye.[38] The bruises are allegedly visible in Malinda's school photographs.[39] No one from the middle school reported these signs of physical abuse.[40]

Malinda's father and Ms. Warren attended a parent/teacher conference eleven days later with one of Malinda's middle school teachers.[41] Mr. Hoagland and Ms. Warren demanded Malinda's teacher allow them to search Malinda's locker while attending the conference.[42] The teacher permitted the search and Mr. Hoagland and Ms. Warren discovered Malinda stashed food in her locker.[43] Mr. Hoagland and Ms. Warren responded by "ragefully burst[ing] out in anger at Malinda and her teacher."[44] Individuals in Coatesville School District (including individuals at North Brandywine Middle School) knew Malinda was underweight and emaciated as of November 2023; her malnourishment had been apparent for months.[45] Despite these signs of child abuse, school officials permitted Malinda to go home with Mr. Hoagland and Ms. Warren after the conference.[46]

The day after the conference, November 7, 2023, an employee at North Brandywine Middle School made a report to Chester County Children, Youth & Families concerning Malinda.[47] The employee reported Malinda often came to school hungry, had bags under her eyes, frequently wore baggy clothes, and at one point came to school with a black eye.[48] An unpleaded person from the Children, Youth & Families office spoke with Ms. Warren on November 8, 2023.[49]

6

An unpleaded person from the office had another call with Ms. Warren and Mr. Hoagland the evening of November 8.[50] Mr. Hoagland and Ms. Warren admitted to intentionally withholding breakfast from Malinda during this second call.[51] No one from the Children, Youth & Families office conducted a home visit of Malinda's home; the Children, Youth & Families office (including Directors Large and Waegel) permitted Malinda to continue living with Ms. Warren.[52]

### Mr. Hoagland and Ms. Warren remove Malinda from North Brandywine Middle School but do not enroll her in a new school.

Mr. Hoagland and Ms. Warren removed Malinda from North Brandywine Middle School and Coatesville School District on December 5, 2023.[53] Around this time, an unpleaded person from the school district made another report to Chester County Children, Youth & Families with concerns for Malinda's safety and access to food.[54] Again, no one from the office visited Malinda's home, interviewed Malinda or her caretakers, or removed Malinda from her home.[55]

Mr. Hoagland and Ms. Warren did not enroll Malinda at a new school after withdrawing her from North Brandywine Middle School.[56] Coatesville superintendents Van Vooren and Hanna and the principal of Scott Sixth Grade Center, Principal Lamothe, knew Malinda's caretakers had not enrolled her in a new school as required by law.[57] The principal of North Brandywine Middle School, Dr. Eugenia Roberts, sent a letter addressed to Malinda's parents or guardians on December 19, 2023, noting Malinda had unlawfully missed school eight days in December.[58] No one in the Coatesville School District reported Malinda's truancy to appropriate authorities.[59] Malinda never returned to school.

### Malinda passes away on May 4, 2024.

Mr. Hoagland and Ms. Warren continued to subject Malinda to physical abuse, sexual abuse, psychological torment, humiliation, and starvation from January 2024 to May 2024.[60] Medical staff admitted Malinda to Paoli Hospital on May 4, 2024 with various injuries and

weighing only fifty pounds.[61] Medical staff pronounced Malinda dead at the age of twelve on May 24, 2024 at 9:58 pm.[62] An autopsy performed after her death revealed Malinda died from starvation and multiple blunt force injuries.[63] Malinda died with approximately seventy-five bruises across her body; contusions, ulcers, and pressure sores; injuries to her brain, heart, lungs, liver, pancreas and intestines; and fractures to her pelvic bone, lower vertebrae, right forearm, and both thigh bones.[64] Police officers searched Malinda's residence on May 4 and May 5, 2024 and discovered surveillance cameras all over the house.[65]

Chester County authorities began criminal proceedings against Mr. Hoagland and Ms. Warren approximately two months after Malinda died. The Commonwealth charged Mr. Hoagland and Ms. Warren with, among many charges, first, second, and third degree murder, kidnapping of a minor to inflict bodily injury, conspiracy, involuntary servitude, and endangering the welfare of children. The Chester County trial judge scheduled trial beginning next week on the several charges.

### Malinda's sisters sue various counties and schools.

Approximately three weeks after the Commonwealth began prosecuting Mr. Hoagland and Ms. Warren in Chester County and about a hundred days after Malinda died, her sisters, Emily Lee, Abbey Hoagland, and Jamie Hoagland, individually and as co-administrators of Malinda's estate, sued persons in Monroe County, Upper Dublin, and Chester County. The Sisters tried to plead substantive due process and negligence theories against Chester County, Monroe County, Coatesville Area School District, North Brandywine Middle School, Horace S. Scott Middle School (also referred to as Scott Sixth Grade Center), Upper Dublin School District, and numerous persons in their individual capacities: Adelaide Grace, the director of Monroe County Office of Children & Youth; Eve Large and Doug Waegel, the directors of Chester County Children, Youth

8

& Families; Catherine Van Vooren and Tomas Hanna, the superintendents of Coatesville Area School District; Kathryn Lamothe, the principal of Scott Sixth Grade Center; Dr. Eugenia Roberts, the principal of North Brandywine Middle School; and Steven M. Yanni, the Superintendent of Upper Dublin School District.[66] We held extensive oral argument following the Chief Judge's reassignment of this case to our docket.[67] We granted the Sisters' request for leave to try to plead claims for the third time requiring we dismiss the Sisters' rhetoric-laden first amended Complaint.[68]

The Sisters amended presumably guided by our extensive examination of their claims during oral argument.[69] They now bring three types of claims: civil rights claims for violating Malinda's substantive due process rights under a state-created danger doctrine, municipal liability claims arising from the violations of Malinda's substantive due process rights, and state law claims for negligence, survival, and wrongful death.

- ***State-created danger substantive due process claims***

The Sisters sue Coatesville Area School District, North Brandywine Middle School, Scott Sixth Grade Center, Coatesville Superintendents Van Vooren and Hanna, Scott Sixth Grade Center Principal Lamothe, and North Brandywine Middle School Principal Roberts, for creating danger to Malinda by releasing her from school into the custody of Mr. Hoagland and Ms. Warren.[70] The Sisters sue Upper Dublin School District and Upper Dublin Superintendent Steven M. Yanni on the same state-created danger theory.[71]

The Sisters sue Chester County, Monroe County, Director Grace, Director Large, and Director Waegel, for creating danger to Malinda by placing her into a residence with Mr. Hoagland and Ms. Warren and permitting her to stay there despite knowing Ms. Warren's status as a convicted child abuser.[72]

9

- *Municipal liability claims*

The Sisters allege Coatesville Area School District, North Brandywine Middle School, Scott Sixth Grade Center, Coatesville Superintendents Van Vooren and Hanna, Scott Sixth Grade Center Principal Lamothe, and North Brandywine Middle School Principal Roberts are liable for Malinda's abuse and death because of their unlawful customs, practices, and policies allowing the substantive due process violations.[73] The Sisters sue Upper Dublin School District and Upper Dublin Superintendent Steven M. Yanni on the same municipal liability theory.[74] The Sisters allege Chester County, Monroe County, Director Grace, Director Large, and Director Waegel, are separately liable for their unlawful customs, practices, and policies concerning their failure to make home visitations, conduct interviews and investigations, and adhere to legal requirements for children in high-risk situations.[75]

The Sisters also sue these same state actors for failing to train their employees how to report and investigate suspected child abuse, place children into appropriate homes, and supervise children living in certain circumstances.[76]

- *State law claims*

The Sisters claim all state actors are liable in damages for negligence, recklessness, and wrongful death.[77] The Sisters also assert a survival action against the state actors.[78]

## II.    Analysis

Monroe County and its Director Grace answered the second amended Complaint on July 11, 2025.[79] Chester County and Chester County Children, Youth & Families Directors Large and Waegel now move to dismiss the claims against them.[80] Coatesville Area School District, Superintendents Van Vooren and Hanna, and Principals Lamothe and Roberts move separately to

10

dismiss.[81] Upper Dublin School District and Superintendent Yanni also move separately to dismiss.[82]

The Sisters oppose Chester County's and the School Districts' Motions.[83] We grant the Motions in part and deny them in part. We dismiss the civil rights claims with prejudice finding the Sisters cannot state a substantive due process claim after three tries. We exercise our discretion to proceed on the state law claims against the state actors in Chester County as we continue to enjoy federal question jurisdiction over the civil rights substantive due process claims against Monroe County and its officials. The federal question as it exists today against Monroe County and its officials arises from the same fact pattern and questions of culpability presently pleaded against Chester County and the School Districts. The question remains the same: who, other than Rendell Hoagland and Cindy Warren, might be liable for the abuse resulting in Malinda's death? We recognize the temporal disconnect between Monroe County's alleged knowledge/conduct and the possible negligence liability of the remaining parties. But so long as the federal question involving Monroe County remains before us, we can exercise supplemental jurisdiction: these fact issues, particularly as to causation, may be intertwined in defenses and potential third-party contribution claims. We find no present judicial economy in declining to resolve the state law question so long as we retain federal question jurisdiction.

### A. We dismiss the Sisters' claim in their individual capacity.

The Sisters purport to sue not only as co-administrators on behalf of Malinda's estate but also individually. This they cannot do. Emily Lee, Abbey Hoagland, and Jamie Hoagland lack authority to sue in their individual capacities because of "the general rule that 'a litigant may only assert his own constitutional rights or immunities,' and the principle that 'one cannot sue for the deprivation of another's civil rights.'"[84] The same principle applies for each Sister's individual

capacity state law negligence and recklessness claims. "At common law, an action for personal injury did not survive death[.]"[85] Pennsylvania's General Assembly "altered this common law rule and provided that causes of action survive a plaintiff's death[.]"[86] Federal law likewise "does not provide for 'the survival of civil rights actions under § 1983 upon the death of either the plaintiff or the defendant[,]'" but "state survival statutes can fill this gap . . ."[87]

But the Pennsylvania Survival Act requires survival actions to be brought by the decedent's *personal representative*.[88] The Sisters may proceed on claims only on behalf of Malinda's estate. We dismiss with prejudice the Sisters' claims brought in their individual capacity.

### B. We dismiss the substantive due process claims against Chester County and the School Districts.

Chester County and the School Districts move to dismiss the Sisters' substantive due process claim, arguing they neither created the danger to Malinda nor had a special relationship with her allowing a jury to impose liability upon them for violating her civil rights.[89] The Sisters respond they allege sufficient facts to state a claim for state-created danger and/or a special relationship necessary to proceed on a substantive due process civil rights claim.[90] We disagree. We afforded the Sisters extensive oral argument with specific guidance and an opportunity to plead a substantive due process claim. They did not. We dismiss the substantive due process claims against Chester County and the School Districts with prejudice.

The principles we apply today are not novel. They may be surprising to a layperson moved by Malinda's tragedy. But governments are not guarantors of safety from crime (even as heinous as the abuse upon Malinda) absent specific conditions created by the government. The Supreme Court held over thirty-five years ago in *DeShaney v. Winnebago County Department of Social Services* the Due Process Clause does not "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors."[91] The Constitution "generally confer[s]

no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."[92] "There are, however, two exceptions to this rule: the 'special relationship' exception and the 'state-created danger' exception."[93] The Sisters seemingly attempt to argue both theories allow them to proceed.

To state a state-created-danger exception to no liability for substantive due process, the Sisters must allege facts (not speculation) allowing us to plausibly infer: (1) Malinda "suffered a 'foreseeable and fairly direct' harm;" (2) "the state 'acted with a degree of culpability that shocks the conscience';" (3) Malinda "'was a foreseeable victim ... or a member of a discrete class of persons' potentially harmed 'by the state's actions'; and" (4) "the state 'affirmatively used [its] authority' to 'create[] a danger' or make her 'more vulnerable to danger than had [it] not acted at all.'"[94]

The special relationship exception, on the other hand, is "a very narrow exception . . . wherein the Constitution *does* 'impose[] upon the State affirmative duties of care and protection with respect to particular individuals.'"[95] "It applies when . . . 'the State takes a person into its custody and holds him there against his will.'"[96] As a general matter, no "special relationship" exists between public schools and students, although our Court of Appeals observed in *Morrow v. Balaski* it may "not foreclose the possibility of a special relationship arising between a *particular* school and *particular* students under certain unique and narrow circumstances."[97]

We address the Sisters' alleged facts about Chester County and the School Districts in turn. We find the Sisters do not plausibly allege any of the parties created a danger to Malinda or had a special relationship with her. We must dismiss the Sisters' substantive due process claims with prejudice as the Sisters have not and cannot plead sufficient facts after three tries.

13

### 1. The Sisters do not plead Chester County created a danger to Malinda or had a special relationship with her.

The Sisters argue they plead sufficient facts for either a state-created danger theory or a special relationship theory against Chester County. We disagree.

#### a. The Sisters do not plead a state-created danger.

The Sisters allege Chester County violated Malinda's substantive due process rights under a state-created danger theory because the County knew Mr. Hoagland and Ms. Warren abused Malinda yet permitted her to stay in their home.[98] Chester County moves to dismiss arguing the Sisters do not plead facts to support an affirmative act, foreseeable harm, or conscience-shocking behavior by the state.[99] Chester County concedes Malinda fell within the discrete class of persons who could suffer harm.[100] The Sisters counter their amended allegations are sufficient at this stage.[101]

The Sisters' amended allegations do not meet the standard for proceeding on a state created danger theory. We start with the fourth element, affirmative conduct, because "it is typically the most contested."[102] "This element asks whether the state's conduct created or increased the risk of danger to the plaintiff."[103] Our Court of Appeals directs "where the state 'undertakes' responsibility for a vulnerable person's wellbeing and then abandons it, abandoning that responsibility is an affirmative act if the state actor had reason to know that the abandonment created a risk of private violence to the plaintiff."[104]

Chester County argues the Sisters do not and cannot plead it affirmatively placed Malinda into the Hoagland/Warren home with her abusive caretakers (which is what the Sisters allege); rather, a liberal reading of the amended allegations only allows us to plausibly infer Chester County failed to remove Malinda from the home.[105] Chester County maintains it could not have created the danger because Mr. Hoagland and Ms. Warren were abusing Malinda well before anyone

advised Chester County Children, Youth & Families concerning possible abuse.[106] The Sisters respond Chester County acted affirmatively because individuals from the Children, Youth & Families office spoke with Mr. Hoagland and/or Ms. Warren on the phone, learned concerning information, then chose not to verify Malinda's safety.[107] The Sisters also argue Chester County acted affirmatively by assuming jurisdiction over Malinda's existing custody case from Monroe County but still making "placement decisions" which authorized Malinda to reside with Ms. Warren.[108]

We must disregard this second argument. The Sisters do not plausibly allege facts to suggest Chester County learned of the custody agreement the instant Malinda moved there with her caretakers. The Sisters plead Chester County could have viewed the custody agreement on the official court docket or on its own internal computer system.[109] But this is mere speculation, not a plausible allegation. We have no reason to believe, based on the Sisters' multiple attempts to plead facts, a custody arrangement created in Monroe County is automatically viewable on Chester County's internal system every time someone moves to Chester County. And viewing the custody agreement on Monroe County's docket would require Chester County to have some reason to check at the docket in the first place. On the pleadings, Chester County would not have had a reason to check the docket until they began receiving reports about Malinda, which led to the phone conversations with Malinda's father and Ms. Warren.

This brings us to our next point: did speaking on the phone with Malinda's caretakers, then taking no further action, create an affirmative act by Chester County? We think not. It is true, as we noted, by "[g]iving and then taking away support[,]" a state actor engages in "active conduct."[110] By talking on the phone with Malinda's caretakers on several occasions, Chester County arguably took responsibility for, or gave support to, Malinda. And by failing to take further

15

action, Chester County arguably abandoned Malinda or took support away. But the state action must render the individual "more vulnerable to danger had [the state actors] not intervened."[111] By way of example: the police stop an intoxicated couple walking home in the cold.[112] They detain the woman but allow her husband to go home.[113] The police later allow the woman to walk home alone.[114] She does not make it home and suffers brain damage from exposure to the cold.[115] The police officers in that instance made the woman more vulnerable to harm because, but for their intervention, the woman's husband might have escorted her safety home.[116] Another example: a nurse supervises a woman visiting her son, a violent psychiatric patient living at a psychiatric hospital.[117] The nurse exits the room halfway through the visit. [118]The psychiatric patient attacks the woman and beats her severely.[119] The nurse in that instance put the woman in danger by starting to supervise, but then ceasing to supervise, the visit.[120]

The phone calls Chester County employees had with Mr. Hoagland and Ms. Warren are different. Chester County may have assumed some responsibility for Malinda when its employees spoke with her caretakers after receiving concerning reports. But Chester County did not leave her *more* vulnerable by not taking further action; it left her only as vulnerable as she had been before the calls. The Sisters do not plead the affirmative conduct required for a state-created danger claim.

The Sisters adequately plead the two other disputed elements of state-created danger. We think it was foreseeable Malinda would suffer harm if Chester County did not investigate Malinda's home situation after hearing—directly from her caretakers—about her unexplained bruises and lack of access to food.[121] And a reasonable jury might find the harm to Malinda (her continued abuse and eventually, her death) was a fairly direct result of Chester County choosing not to visit her home and remove her from harm.[122] We also think the County's decision not to conduct even one home visit, at least at the pleading stage, shocks the conscience.[123]

16

But these elements, without an affirmative act, are not enough. The Sisters do not and cannot after multiple attempts plausibly allege Chester County created a danger to Malinda in violation of her substantive due process rights.

### b.  The Sisters do not plead a special relationship.

The Sisters do not assert a special relationship claim against Chester County but they nevertheless plead the existence of a special relationship.[124] Chester County responds arguing it did not have a special relationship with Malinda because it never restricted her liberty or took her into custody.[125] The Sisters counter Chester County misunderstands the law because a state-created danger claim does not require a special relationship and, in any event, Chester County had a special relationship with Malinda because such a relationship exists when a state agency exercises control over the custody of a child.[126] We address the special relationship theory although a special relationship claim is not specifically pleaded because the parties fulsomely address the issue in their briefing.

We agree with Chester County. First, the Sisters inaccurately claim Chester County misunderstands the law. Chester County does not argue a special relationship is a necessary part of a state-created danger claim. And the Sisters do allege the existence of a special relationship, so any resultant confusion from Chester County as to whether the Sisters intended to state a special relationship claim, is understandable. The Sisters also err about the existence of a special relationship between Chester County and Malinda. The cases they cite are plainly distinguishable. *Nicini v. Morra*,[127] *Naparsteck v. Pennsylvania Department of Public Welfare*,[128]and *S.B. v. City of Philadelphia*[129] all involved children in the foster system or analogous situations. The youth services office in each of these cases approved the foster home or other living arrangement where

17

the child ultimately suffered harm.[130] As such, a special relationship existed between the youth services office and the child.

But the Sisters do not and cannot allege Chester County had direct oversight of Malinda's living situation. Malinda's parents entered a custody agreement and Malinda's father breached the agreement by bringing Malinda into a home with Ms. Warren. The Sisters do not plead facts allowing us to infer Malinda ever entered the custody of Chester County Children, Youth & Services. We decline to find a special relationship.

We dismiss the special relationship substantive due process claim against Chester County to the extent the Sisters improperly attempt to amend their allegations to assert such a claim through their briefing.

### 2. The Sisters do not plead the School Districts created a danger to Malinda or had a special relationship with her.

The Sisters also argue they plead sufficient facts for either a state-created danger theory or a special relationship theory against the School Districts. We again disagree.

### a. The Sisters do not plead a state-created danger.

The Sisters allege the School Districts violated Malinda's substantive due process rights under a state-created danger theory because employees of the School Districts repeatedly released Malinda into the care of Mr. Hoagland and Ms. Warren despite knowing their abusive conduct in the home posed a serious risk of harm to Malinda.[131] The School Districts move to dismiss arguing the Sisters do not plead facts to state a claim for state-created danger.[132] The Sisters counter their allegations are sufficient to proceed to discovery.[133]

We agree with the School Districts; the Sisters' allegations are insufficient. The School Districts both argue they did not engage in affirmative conduct.[134] Coatesville School District seemingly suggests—but does not say directly—it did not engage in affirmative conduct because

18

Malinda's abusive home environment started before Malinda transferred to Coatesville and simply continued during her time there.[135] Coatesville later argues (but only in its reply brief) by allegedly failing to intervene and permitting the abuse to continue, Coatesville simply maintained the status quo, which is not the same as an affirmative act.[136] Upper Dublin School District similarly argues it did not affirmatively alter the status quo by releasing Malinda back into a danger that was already present.[137] The Sisters counter the School Districts acted affirmatively each time they chose to release Malinda back into Ms. Warren's care.[138]

We focus our analysis on the alleged repeated instances of the School Districts permitting Malinda to leave with Ms. Warren.[139] We look to our Court of Appeals's decision nine years ago in *L.R. v. School District of Philadelphia* for guidance in deciding whether letting Malinda leave school with Ms. Warren constituted affirmative conduct.[140] In *L.R.*, an unknown woman entered an elementary school and attempted to pick a child up from school.[141] The child's teacher asked the woman to produce identification and verify the child had permission to leave school with her.[142] The woman failed to do so but the teacher still allowed the child to go with her.[143] The woman sexually assaulted the child off school premises later that day.[144] The child's parent sued the teacher and the school district alleging the teacher deprived the child of her Fourteenth Amendment rights under a state-created danger theory.[145] The school moved to dismiss, arguing the teacher's failure to follow school district policy and failure to obtain identification from the assailant were not affirmative acts, but rather, "inactions."[146]

Our Court of Appeals found the school district's distinctions "unavailing."[147] The court approached the case by evaluating the "status quo" of the environment before the alleged act or omission and then asking whether the state actor's exercise of authority departed from the status quo.[148] The status quo was a typical kindergarten classroom where the child was safe until her

teacher allowed her to leave with the assailant.[149] The teacher's "actions resulted in a drastic change to the classroom status quo, not a maintenance of a situation that was already dangerous."[150] Our Court of Appeals concluded the teacher "affirmatively misused his authority[,]" and held the child could proceed on a claim for state-created danger.[151]

The Sisters' allegations are plainly and materially different than the allegations addressed by our Court of Appeals in *L.R.* It is true both the child in *L.R.* and Malinda Hoagland were safe in their classrooms, and they became unsafe when their teachers or other school personnel permitted them to leave with abusive adults. But the difference is the child in *L.R.* did not live with the woman who picked her up and later assaulted her, and the school did not know the relationship between the student and the adult. When the child's teacher in *L.R.* allowed her to leave "with an adult who failed to produce proper identification or verification, he exposed [her] to a danger she would not have otherwise encountered."[152] If the teacher had not allowed the child to leave with the abuser, presumably her parent or guardian would have picked her up and she would not have suffered harm.

Malinda, by contrast, lived with Ms. Warren. The Sisters admit the School Districts knew Malinda was residing full-time with Ms. Warren, a convicted child abuser, and repeatedly placed Malinda into her care despite knowing she had no custodial rights over Malinda.[153] Yet the Sisters also allege no one from the School Districts confirmed Ms. Warren's identity or checked whether she had authority to take Malinda from school.[154] So it is unclear whether the Sisters allege the School Districts created danger to Malinda by knowingly permitting her to go home with Ms. Warren or by permitting her to go home with someone the School Districts did not know at all. Either way, if the School Districts had refused to permit Malinda to leave school with Ms. Warren, and Mr. Hoagland picked her up instead, Malinda still would have been exposed to abuse from

20

Ms. Warren at home. Malinda's status quo, tragically, was living in an abusive home. She received some respite from the abusive environment when she went to school. But the School Districts did not "expose[] [her] to a danger she would not have otherwise encountered[]" by permitting her to leave with Ms. Warren.[155] The danger remained the same. The Sisters do not plead the affirmative conduct required for a state-created danger claim.

We address the remaining elements: foreseeable and fairly direct harm, conscience-shocking conduct, and membership in a discrete class of persons potentially harmed by the state's actions.[156] As to foreseeable and fairly direct harm, it may have been foreseeable Malinda would suffer harm if the School Districts permitted her to go home with Ms. Warren. We again note the Sisters contradict their own allegations by swearing the School Districts knowingly permitted Malinda to go home with a child abuser but also swearing the School Districts let Malinda go home with an unidentified person. Either way, we think the Sisters adequately pleads foreseeability as it is foreseeable a child could suffer harm if permitted to go home with a known child abuser or with an unidentified person.[157] But Malinda's harm was not a fairly direct result of the School Districts letting Ms. Warren pick Malinda up. Malinda lived with Ms. Warren. She would have been vulnerable to harm regardless of whether the School Districts stopped letting Ms. Warren get her from school. "The causation, if any, is too attenuated[]" for us to find Malinda's harm was a direct result of the School Districts' conduct.[158]

The Sisters' allegations also fall short as to conscience-shocking conduct, at least as to Coatesville School District. The Sisters argue it is conscience-shocking that employees of both Coatesville School District and Upper Dublin School District ignored signs of Malinda's abuse, took no steps to verify Ms. Warren's "authority," and failed to repeatedly contact protective services and/or follow up with them.[159] We might agree repeatedly failing to check someone's

identity before sending a child home with the person could shock the conscience.[160] But we cannot tell if that is what happened given the Sisters' contradictory allegations the School Districts knowingly sent Malinda home with Ms. Warren.[161]

And the Sisters' argument the School Districts ignored signs of Malinda's abuse and failed to contact protective services is inconsistent with other allegations about Coatesville School District: the Sisters plead Coatesville employees reported concerns about Malinda's safety to Chester County Children, Youth & Services on at least two—likely three—occasions.[162] Coatesville arguably should have reported concerns about Malinda's safety earlier than it did, or more frequently. But the Sisters plead Coatesville responded appropriately several times when it witnessed particularly alarming signs of abuse: bruises on Malinda, odd behavior by Malinda's caretakers at her school conference, and the abrupt withdrawal of Malinda from school. So we cannot say Coatesville behaved with deliberate indifference as required for us to find conscience-shocking conduct. The allegations against Upper Dublin School District are a closer call: the Sisters allege throughout Malinda's time at Upper Dublin, as with her time at Coatesville, she exhibited signs of abuse including large bruises and emaciation.[163] But, unlike Coatesville, the Sisters do not plead any Upper Dublin employees reported concerns of abuse to child protective services. This failure to report arguably reaches the level of deliberate indifference.[164]

We find the Sisters sufficiently plead the "foreseeable victim" element: Malinda was "a 'member of a discrete class of persons subjected to the potential harm brought about by the state's actions,' as opposed to a member of the public in general[.]"[165]

But the Sisters still have not, after three attempts, pleaded facts necessary for us to plausibly infer state-created danger. Neither of the School Districts engaged in affirmative conduct and the harm to Malinda was not a fairly direct result of the School Districts allowing Ms. Warren to pick

Malinda up from school. We find the Sisters do not plausibly allege the School Districts created a

danger to Malinda in violation of her substantive due process rights.

### b.  The Sisters do not plead a special relationship.

We must again address the special relationship exception because even though the Sisters

do not assert a special relationship claim against the School Districts, they still plead the School

Districts had a special relationship with Malinda and argue the exception in their briefing.[166]

Coatesville School District argues in a conclusory fashion the Sisters do not plead facts to support

a special relationship.[167] Upper Dublin School District argues it did not have a special relationship

with Malinda because, generally speaking, Pennsylvania's compulsory attendance laws and a

public school's *in loco parentis* authority does not impose a constitutional duty on the school to

protect students from private harm—and in this particular case, Upper Dublin did not impose

restraints on Malinda's liberty.[168] The Sisters counter they actually do allege a special relationship

because the School Districts and their employees were educators of a minor student who could not

make her own decisions about where she resided.[169] The Sisters argue because the School Districts

knew Mr. Hoagland and/or Ms. Warren were physically abusing, starving, and torturing Malinda,

the School Districts' relationship with Malinda exceeded the limitations our Court of Appeals has

placed on finding special relationships between students and schools exercising *in loco parentis*

authority.[170]

We disagree with the Sisters' reasoning. For one thing, their argument is something close

to a circular argument. They argue a special relationship existed between Malinda and the School

Districts because Malinda suffered abuse at home, and because Malinda suffered abuse at home,

the School Districts had an affirmative duty to protect her. But "the state's constitutional 'duty to

protect arises ***not from the State's knowledge of the individual's predicament*** or from its

23

expressions of intent to help [her], but from the limitation which it has imposed on [her] freedom to act on [her] own behalf.'"[171] The Sisters do not plead the School Districts imposed limitations on Malinda's freedom. We recognize our Court of Appeals in *L.R.* mentioned in dicta the possibility of a special relationship between a school and its "youngest and most vulnerable students."[172] But this special relationship would still depend on "the age and/or dependency of certain students ***in combination with restraints a school may place on its students*** . . . ."[173] The Sister does not plead the School Districts placed restraints on Malinda allowing us to proceed under a special relationship exception.[174]

We dismiss the special relationship substantive due process claim against the School Districts to the extent the Sisters attempt to assert such a claim.

### C. We dismiss the municipal liability claims against Chester County and the School Districts.

We turn next to the Sisters' allegations of municipal liability permitted under federal law.[175] The Sisters allege Chester County had unconstitutional customs, practices, and policies such as refusing to make required visits to the homes of abused children, refusing to investigate reported child abuse, refusing to report criminal child abuse to law enforcement agencies, and placing children into the custody of dangerous adults; and these customs, practices, and policies caused Malinda's harm.[176] The Sisters allege the School Districts had unconstitutional customs, practices, and policies such as ignoring legal requirements to report child abuse to state and county officials, releasing children into the custody of dangerous adults, and ignoring truancy law, and these customs, practices, and policies caused Malinda's harm.[177] The Sisters also allege Chester County and the School Districts failed to train their employees about reporting and investigating suspected child abuse, appropriate child placement and supervision, and oversight of children during custody litigation.[178]

Chester County moves to dismiss the Sisters' municipal liability *Monell* claims, arguing, among other things, there can be no municipal liability without an underlying constitutional violation.[179] Chester County further argues the Sisters' allegations are too conclusory to state a municipal liability claim for policies/customs or for failure to train.[180] Coatesville School District argues the Sisters do not plead a custom or policy which deprived Malinda of a constitutional right: although the Sisters possibly allege the School District had a policy regarding the documentation of absences, the allegations do not support a determination this policy caused Malinda's harm.[181] Upper Dublin School District argues the Sisters do not specify an official policy and do not allege Upper Dublin had knowledge of similar unlawful conduct in the past.[182] The Sisters respond to Chester County and Coatesville School District by simply repeating the allegations from the second amended Complaint.[183] The Sisters' response to Upper Dublin School District is more detailed. There the Sisters concede (although Upper Dublin does not actually make this argument) *Monell* municipal liability cannot attach unless a constitutional violation occurred—but the Sisters argue they adequately plead underlying constitutional violations.[184]

We agree we cannot proceed on the municipal liability claims without an underlying constitutional violation. "[A] municipality cannot be held liable under [section] 1983 on a *respondeat superior* theory."[185] "The municipality itself must cause the constitutional violation at issue."[186] "To plead a municipal liability claim, a plaintiff must allege that 'a [local] government's policy or custom ... inflict[ed] the injury' in question."[187] "[I]n the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation of a party's constitutional rights under [section] 1983."[188] But "if there is no underlying constitutional violation, *Monell* liability cannot exist."[189]

The Sisters do not plead Chester County or the School Districts violated Malinda's substantive due process rights. The constitutional claim against Chester County cannot proceed because the Sisters do not plausibly allege affirmative conduct under a state-created danger theory. Nor do the Sisters plausibly allege Chester County had a special relationship with Malinda because she was not in foster care. The constitutional claim against the School Districts cannot proceed because the Sisters do not plausibly allege affirmative conduct or foreseeable and fairly direct harm (or, as to Coatesville, conscience-shocking behavior) under a state-created danger theory. Nor do the Sisters plausibly allege the School Districts had a special relationship with Malinda because the School Districts did not limit Malinda's freedom.

The Sisters plead facts about certain policies, customs, and inadequate training by Chester County and the School Districts. But because the Sisters do not state a claim for an underlying constitutional violation, their reiteration of the parties' policies and training practices cannot create a basis for the municipal liability *Monell* claims to proceed to discovery. We dismiss the Sisters' policy and failure-to-train municipal liability claims.

### D. We dismiss the negligence claim against the School Districts but the Sisters may proceed with their negligence claim against Chester County.

The Sisters also claim Chester County and the School Districts owe damages to Malinda's estate arising from negligence and recklessness under Pennsylvania law.[190] Chester County and the School Districts move to dismiss these claims, arguing they are immune under the Pennsylvania Political Subdivision Tort Claims Act and/or the Child Protective Services Law.[191] Chester County and Coatesville School District focus on statutory interpretation, arguing the Tort Claims Act's exception for sexual abuse does not apply unless a municipal employee committed the sexual abuse.[192] Upper Dublin School District, by contrast, argues the sexual abuse exception does not apply because the Sisters do not plead sexual abuse occurred while Malinda attended

26

Upper Dublin.[193] The Sisters respond none of the parties are immune because the Tort Claims Act carves out a statutory exception for sexual abuse caused by the negligent acts or omissions of the agency (which does **not** require the municipal actor commit the sexual abuse) and the Child Protective Services Law is not applicable.[194]

The Pennsylvania General Assembly through the Tort Claims Act "grants municipal agencies and employees statutory immunity."[195] The General Assembly through section 8541 of the Act provides "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[196] "Municipal employees, including school district employees, are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment."[197] Employees are *not* immune from liability under section 8545 if their conduct amounts to a crime, actual malice, or willful misconduct.[198] The General Assembly also carves out nine enumerated exceptions to municipal immunity under section 8542 for injuries "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties . . . ."[199] One of the acts which "may result in the imposition of liability on a local agency" is sexual abuse—*i.e.*, any of the sex crimes enumerated in section 5551(7)—"if the injuries to the plaintiff were caused by actions or omissions of the local agency which constitute negligence."[200]

We find Chester County and Coatesville School District are not immune from liability under the Tort Claims Act because of the statutory exception for sexual abuse. But the Sisters plausibly allege negligence only against Chester County. We find Upper Dublin School District is immune under the Act because the Sisters do not plead sexual abuse occurred during Malinda's

time at Upper Dublin. We deny Chester County's Motion to dismiss the negligence claim[201] but we grant the School Districts' Motions.

### 1. Chester County is not immune under the Tort Claims Act and the Sisters sufficiently plead the County's negligence.

Chester County argues the language of the Act means "[t]here must be both an act by a local agency or any of its employees that constitutes an offense enumerated under section 5551(7) **and** the injuries suffered by the plaintiff must be caused by actions or omissions of the local agency which constitute negligence."[202] And thus Chester County is immune because the Sisters do not allege an employee from Chester County engaged in an act which constitutes an offense under section 5551(7).[203] The Sisters counter Chester County "misreads the plain language of the [Act,]" which "does not require that the perpetrator of the abuse be a state actor themselves[.]"[204] Chester County replies section 8542(b) provides "[t]he following acts by a local agency or any of its employees may result in the imposition of liability on a local agency[,]" and this preceding clause must be read together with subsection (9).[205] Taken together, Chester County argues the General Assembly requires an act by a local agency or its employee **and** requires that the injuries be caused by negligent actions or omissions of the agency.[206]

We agree with the Sisters. The General Assembly does not confer immunity upon municipal employees for crimes and willful misconduct.[207] So it would make little sense if the exception imposing municipal liability for instances of sexual abuse only applied when a **municipal employee** commits sexual abuse—because employees who commit crimes are already excluded from the Act's protections.

Chester County's argument about reading section 8542(b) together with subsection (9) is also misplaced. If we look at subsection (9) in a vacuum, we can see the confusion: perhaps the "act[] by a local agency or any of its employees" in section 8542(b) refers to the bold heading of

28

"**Sexual abuse**" in subsection (9), which might indicate an employee must be the person who commits the sexual abuse. But this does not make sense when we look at the other subsections, which contain headings in bold font such as "**Real property**", "**Streets**", and "**Sidewalks.**"[208] Real property, streets, and sidewalks are not "acts" which can be committed by local agencies or their employees. So we must assume the bolded words in each subsection are simply headings used to describe the content of the subsection and the "act[] by a local agency—for which immunity is waived—is whatever comes after the bolded heading. Here the relevant "act" is a negligent "action[] or omission[] of the local agency" which causes a person to be sexually abused.

We are also guided by several of our colleagues who have found "[s]ection 8542(b) does not limit the sexual abuse exception solely to sexual abuse committed by local agency employees."[209] Rather, "[a] plaintiff must merely demonstrate that the local agency's alleged acts or omissions were the proximate cause of the sexual assault."[210] We find Chester County is not immune under the Tort Claims Act for the sexual abuse.

Chester County also argues it is immune under Pennsylvania's Child Protective Services Law.[211] The General Assembly through this Law grants immunity to agencies and agency employees who, in good faith, make a report of suspected child abuse, cooperate with an investigation, testify in a proceeding involving child abuse, or perform other related activities.[212] The Sisters counter the clear language of the Law only provides immunity to a person who makes a report of child abuse to the authorities, not to the agency who receives the report.[213] We agree with the Sisters on this point; section 6318(a)(1) only contemplates immunity for someone who *makes* a report of suspected child abuse.[214] And section 6318(a)(2) only contemplates immunity for someone who *cooperates or consults with* an investigation, not someone who conducts an investigation.[215] As the Sisters point out, Chester County does not provide us with authority (nor

29

have we found any) where a judge found a child protective agency tasked with receiving and investigating reports of child abuse immune under the Law. We agree Chester County is not immune from a negligence claim based on the plain language of the Law.

Chester County does not challenge the Sisters' negligence claim on the merits but only seeks to invoke immunity under the Tort Claims Act and the Child Protective Services Law. We deny its narrow Motion to dismiss the negligence claim after finding the County is not immune under either statute.[216]

### 2. Coatesville School District is not immune under the Tort Claims Act but the Sisters do not plead Coatesville's negligence.

Coatesville School District, like Chester County, argues it is immune under the Pennsylvania Political Subdivision Tort Claims Act because the exception to immunity for instances of sexual abuse is only applicable if School employees committed the sexual abuse. We disagree with Coatesville's reading of the Act. As explained above, Coatesville is not immune under the Tort Claims Act because the statutory exception, which claws back immunity for sexual abuse, applies. We decline to dismiss the negligence claim against Coatesville on immunity grounds.

Coatesville School District further argues the negligence claim fails because the Sisters do not adequately plead a duty. According to Coatesville, the Sisters did not "sufficiently plead facts that support that claim that [Coatesville] breached a duty a duty that they owed to Malinda that then caused Malinda's father and his father's girlfriend to kill Malinda."[217] Coatesville also argues the Sisters do not plead facts suggesting Malinda's death was a reasonably foreseeable result of Coatesville's alleged failure to correctly document Malinda's absences and/or notice when she came to school hungry and bruised.[218] The Sisters counter Coatesville breached its duty to Malinda

30

because it failed to report obvious signs of physical abuse and its failure to act directly and proximately caused Malinda to suffer sexual abuse.[219]

We agree with Coatesville. "The 'elements of a negligence-based cause of action are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss.'"[220] Although Coatesville's argument is not a model of clarity, it seems to dispute the first three elements: the existence of a duty to Malinda, a breach of that duty, and a causal relationship between the breach and the injury to Malinda.

Neither party satisfactorily briefs the issue of what duty, if any, Coatesville School District owed to Malinda. Coatesville argues the general duty of care imposed on all persons not to place others at risk does not mean a person must *intercede* to prevent harm from a third person.[221] We agree in part. The Restatement (Second) of Torts provides: "[o]ne who is required by law to take or who voluntarily takes the custody of another . . . is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other" under certain circumstances.[222] This duty to control the conduct of third persons applies "to teachers or other persons in charge of a public school."[223] But as our Court of Appeals has recognized, the *in loco parentis* duty a school owes to a student ends when the student leaves the school.[224] "Once the child is out of a school's control, the school no longer stands in the shoes of the parents."[225] So while Coatesville owed Malinda a duty to protect her from harm from third parties while she was at school, it did not owe her a duty to protect her once she left school at the end of each day.

But Coatesville did have a statutory duty to report abuse. The General Assembly requires school employees to "make a report of suspected child abuse . . . if the person has reasonable cause to suspect that a child is a victim of child abuse[.]"[226] "Child abuse" is defined to include causing

31

bodily injury to a child, sexually abusing a child, and causing the death of a child.[227] The Sisters do not bring a negligence per se claim based on Coatesville's alleged failure to comply with the reporting requirements in the Act. So we must consider whether the Sisters adequately plead Coatesville had a common law duty to report suspected child abuse to Malinda.

We find Coatesville did not have a common law duty to report. Our Court of Appeals examined a similar issue in *Nace v. Pennridge School District*.[228] There, a high school student sued Faith Christian Academy, Pennridge School District, and multiple school employees seeking damages for sexual abuse by her basketball coach.[229] The high school student asserted claims for ordinary negligence and negligence per se based on a violation of Pennsylvania's Child Protective Services Law requiring school employees to report suspected sexual abuse of students.[230] Our Court of Appeals reversed the district court's grant of summary judgment on the negligence per se claim, finding a genuine dispute as to whether certain school employees were required to report the coach's conduct to authorities under the Child Protective Services Law.[231] But the Court found the trial court did not err in granting summary judgment on the common law negligence claim. The Court explained: "the Pennsylvania legislature's imposition of a duty to report under specific circumstances in the [Law] reflects the legislature's judgment that the burden of reporting is outweighed by its benefits only where there is reasonable cause to suspect sexual abuse or sexual exploitation and where there are protections in place for innocent accused employees."[232]

Our Court of Appeals's analysis in *Nace* is not exactly on point because the specific subsection of the Child Protective Services Law the student alleged the school employees had violated has since been repealed. But the reasoning from *Nace* still applies. The General Assembly imposes certain reporting requirements for school employees when they have reasonable cause to suspect child abuse. "[I]mposing a broader common law duty to report may disrupt the careful

32

balancing of interests that the Pennsylvania legislature viewed to be proper."[233] We must follow the guidance of our Court of Appeals and "decline to impose . . . a common law duty to further disclose [suspected child abuse] beyond the duty imposed by the [Child Protective Services Law]."[234]

Without a plausibly alleged duty, the Sisters' negligence claim against Coatesville School District can go no further. We grant Coatesville's Motion to dismiss the negligence claim.

### 3. Upper Dublin School District is immune.

Upper Dublin School District argues it is immune under the Tort Claims Act because the Sisters do not plead Malinda suffered sexual abuse during her time at Upper Dublin.[235] The Sisters respond their allegations of sexual abuse (*e.g.*, Malinda being chained and filmed naked) are sufficient to justify discovery into Upper Dublin's knowledge of the abuse.[236] The Sisters do not address Upper Dublin's timing concerns.

We agree with Upper Dublin. The Sisters do not allege when the sexual abuse occurred. They do allege Chester County had the authority to remove Malinda from her residence where she was sexually abused.[237] So we can infer Malinda experienced sexual abuse at home while she attended school in Coatesville School District because Coatesville School District is in Chester County. But Upper Dublin School District is in Montgomery County. The Sisters' allegations about what happened to Malinda while she lived in Chester County do not permit us to draw an inference about the nature of the abuse her caretakers inflicted on her while she attended school in Upper Dublin School District. The Sisters could (but do not) point to their recitation of the elements of negligence, many of which concern the School Districts' alleged failure to investigate sexual abuse.[238] Even if the Sisters made this argument, our conclusion would remain the same: the Sisters' conclusory allegations found in the legal counts of the second amended Complaint are

insufficient for us to infer Malinda suffered sexual abuse at home while attending school in Upper Dublin. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[239] Because we have no pleaded facts to suggest Malinda's sexual abuse at home overlapped with her enrollment at Upper Dublin School District, we cannot credit the Sisters' allegations the school and its employees did not properly investigate sexual abuse.

The General Assembly through the Tort Claims Act carves out several exceptions to the governmental immunity conferred upon municipal employees. The only statutory exception applicable to this case is the sexual abuse exception, which waives immunity if the negligent actions or omissions of a local agency or its employees causes someone to be sexually abused. This exception does not apply without plausible allegations of Malinda experiencing sexual abuse at home while she attended an Upper Dublin school. And Upper Dublin and its employees are immune from other alleged negligent acts. We must grant Upper Dublin's Motion to dismiss the negligence claim.

### E.  We dismiss the survival and wrongful death claims against the School but deny Chester County's Motion to dismiss the same claims.

We must now consider the extent to which the Sisters' survival and wrongful death claims remain in the case. The survival and wrongful death claims against the School Districts must be dismissed because we dismissed the other claims against them.[240]

But one tort claim remains against Chester County: the negligence claim.[241] As such, the survival claim must remain because it is the vehicle through which the negligence claim is asserted. In other words, "the survival statutes . . . simply permit a personal representative to enforce a cause of action which has *already accrued* to the deceased before [her] death."[242] "The survival action has its genesis in the decedent's injury, not [her] death."[243]

34

By contrast, "a wrongful death claimant's substantive right to recover is derivative of and dependent upon a tortious act that ***resulted in*** the decedent's death."[244] The Sisters do not plead the sexual abuse to Malinda "resulted in" her death. They allege starvation and blunt force injuries, not injuries caused by sexual abuse, as Malinda's official cause of death. The connection between Malinda's death and Chester County is tenuous. But Chester County does not move to dismiss the wrongful death claim on the basis the Sisters do not plausibly allege causation between Malinda's sexual abuse and her death.[245] And in any event, "the question of whether [d]efendants' negligence was a proximate cause of the injury is ordinarily one to be decided by the fact finder."[246]

We deny Chester County's Motion to dismiss the survival and wrongful death claims to the extent it moves to dismiss them.

### III.    Conclusion

Malinda's death was a tragedy. We appreciate the Sisters' desire for someone to be held accountable, just as we appreciate zealous advocacy. But this lawsuit is in large part an instance of "sad case, wrong defendants." The Sisters attempt to move beyond well-established boundaries on a local government's role in private conduct in the parental home. This they cannot do.

The Sisters may proceed on behalf of Malinda's estate only against Chester County and only with their negligence, survival, and wrongful death claims along with their presently unchallenged claims against Monroe County and its Director. We dismiss the remaining claims against Chester County and all federal and state law claims against the School Districts.

---

[1] ECF 65 ¶ 28.

[2] *Id.* ¶¶ 25–26.

---

[3] *Id.*

[4] *Id.* ¶ 26.

[5] *Id.* ¶ 25.

[6] *Id.* ¶¶ 28. Monroe County sits in the Middle District of Pennsylvania.

[7] *Id.* ¶ 29. It is unclear when Mr. Hoagland and Malinda's mother entered the custody agreement. The Sisters allege the agreement began before Mr. Hoagland and Ms. Warren began their relationship in the fall of 2019 but they also reference "the July 2020 implementation of a custody agreement[.]" ECF 65 ¶¶ 29, 34.

[8] *Id.* ¶ 29.

[9] *Id.* ¶¶ 31–32.

[10] *Id.* ¶ 33. The Sisters do not plead where Malinda, Mr. Hoagland, and Ms. Warren lived while Malinda attended school in Upper Dublin School District.

[11] *Id.* ¶ 35.

[12] *Id.* ¶¶ 37, 40.

[13] *Id.* ¶ 82.

[14] *Id.* ¶ 30.

[15] *Id.* ¶ 41.

[16] *Id.* ¶ 42.

[17] *Id.* ¶ 43.

[18] *Id.* ¶ 44.

[19] *Id.* ¶ 45.

[20] *Id.* ¶ 46.

[21] *Id.*

[22] *Id.* ¶¶ 47–49.

[23] *Id.* ¶ 51.

[24] *Id.* ¶ 52. The Sisters allege Malinda also had at least one unexcused absence from school while she attended Scott Sixth Grade Center. *Id.* ¶ 50.

[25] *Id.* ¶ 52.

[26] *Id.*

[27] *Id.* ¶¶ 54, 57. It is unclear from the Sisters' allegations why Kathryn Lamothe, the principal of Scott Sixth Grade Center, sent letters to Mr. Hoagland concerning Malinda's absences from North Brandywine Middle School.

[28] *Id.* ¶¶ 54–55, 57.

[29] *Id.* ¶¶ 56, 58.

[30] *Id.* ¶ 60.

[31] *Id.*

[32] *Id.* ¶ 62. Chester County's official website describes ChildLine as "a 24/7 hotline for reports of suspected child abuse." *FAQs*, CHESTER COUNTY PENNSYLVANIA, https://www.chesco.org/Faq.aspx?QID=1025 (last visited Aug. 11, 2025).

[33] *Id.* ¶ 63.

[34] *Id.* ¶ 64.

[35] *Id.* ¶ 65.

[36] *Id.* ¶¶ 66–67.

[37] *Id.* ¶ 67.

[38] *Id.* ¶ 68.

[39] *Id.*

[40] *Id.*

[41] *Id.* ¶ 69.

[42] *Id.*

[43] *Id.* ¶ 70.

---

[44] *Id.* ¶ 72.

[45] *Id.* ¶ 71.

[46] *Id.* ¶ 73.

[47] *Id.* ¶ 74.

[48] *Id.* ¶ 75.

[49] *Id.* ¶ 76.

[50] *Id.* ¶ 78.

[51] *Id.*

[52] *Id.* ¶¶ 76–77, 79.

[53] *Id.* ¶ 80.

[54] *Id.* ¶ 81.

[55] *Id.* ¶ 83–85.

[56] *Id.* ¶ 86.

[57] *Id.* ¶ 86. It is unclear why Kathryn Lamothe, the principal of Scott Sixth Grade Center, knew Malinda's caretakers did not enroll her in a new school after they removed her from North Brandywine Middle School.

[58] *Id.* ¶ 87.

[59] *Id.* ¶ 88.

[60] *Id.* ¶ 89.

[61] *Id.* ¶ 90.

[62] *Id.* ¶ 91.

[63] *Id.* ¶ 92.

[64] *Id.*

[65] *Id.* ¶ 93.

38

[66] The Sisters also sued Laurie Smith, another Upper Dublin Superintendent, but they dismissed the claims against Superintendent Smith with prejudice. ECFs 83, 84.

[67] ECFs 58, 59.

[68] ECF 61.

[69] ECF 65.

[70] *Id.* ¶¶ 99–105. The Sisters also allege these state actors sent inaccurate correspondence to Mr. Hoagland and Ms. Warren regarding Malinda's truancy, lack of medical documentation, and vaccination status, which "rendered Malinda . . . more vulnerable and at risk" than she would have been "had these defendants not misused their authority in this manner." *Id.* ¶ 104.

[71] *Id.* ¶¶ 99–105.

[72] *Id.* ¶¶ 106–16. The Sisters also allege these state actors made phone calls to Mr. Hoagland and Ms. Warren and "transmit[ed] false and inaccurate information to the Commonwealth of Pennsylvania, regarding numerous reports of child abuse of Malinda . . . all of which allowed Malinda to remain in a dangerous home environment . . . ." *Id.* ¶ 115.

[73] *Id.* ¶¶ 117–24.

[74] *Id.*

[75] *Id.* ¶¶ 125–32.

[76] *Id.* ¶¶ 133–38.

[77] *Id.* ¶¶ 139–53.

[78] *Id.* ¶¶ 154–58.

[79] ECF 71.

[80] ECF 68. We refer to Chester County and its agents collectively as "Chester County" or "the County."

[81] ECF 69. The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility that a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Hum. Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 668).

[82] ECF 70. We refer to Coatesville Area School District and its agents collectively as "Coatesville School District" or "Coatesville." We refer to Upper Dublin School District and its agents collectively as "Upper Duplin School District" or "Upper Dublin." We refer to Coatesville Area School District, its schools, and its agents, together with Upper Dublin School District and its agents, collectively as "the School Districts."

[83] ECFs 72, 74, 78.

[84] *O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973) (first quoting *United States v. Raines*, 362 U.S. 17, 22 (1960) and *McGowan v. State of Md.*, 366 U.S. 420, 429 (1961); then citing C. ANTIEAU, FEDERAL CIVIL RIGHTS ACT: CIVIL PRACTICE § 31 (1971)).

[85] *Dubose v. Quinlan*, 173 A.3d 634, 645 (Pa. 2017) (alteration in original) (quoting *Pennock v. Lenzi*, 882 A.2d 1057, 1064 n.8 (Pa. Commw. Ct. 2005)).

[86] *Id.*

[87] *Holmes v. City of Wilmington*, 79 F. Supp. 3d 497, 506 (D. Del. 2015) (first quoting *Moor v. Alameda County*, 411 U.S. 693, 703 n.14 (1973); then citing *Robertson v. Wegmann*, 436 U.S. 584 (1978)).

[88] *See Probst v. Williamsport, PA (Police Officer)*, No. 23-1231, 2023 WL 5017963, at *2 (E.D. Pa. Aug. 7, 2023) ("Under the survivorship statute, all actions that survive the decedent must be brought by or against the personal representative of the decedent's estate." (citing *Salvadia v. Ashbrook*, 923 A.2d 436, 439 (Pa. Super. Ct. 2007))). Likewise, "an action for wrongful death shall be brought only by the personal representative of the decedent for the benefit of those persons entitled by law to recover damages for such wrongful death." PA. R. CIV. P. No. 2202(a).

[89] ECF 68-1 at 5–14; ECF 69-1 at 8–11.

[90] ECF 72-2 at 7–15; ECF 74-2 at 8–15.

[91] 489 U.S. 189, 195 (1989).

[92] *Id.* at 196 (first citing *Harris v. McRae*, 448 U.S. 297, 317–318 (1980); then citing *Lindsey v. Normet*, 405 U.S. 56, 74 (1972); and then citing *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982)).

[93] *Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007) (footnote omitted).

40

---

[94] *Mears v. Connolly*, 24 F.4th 880, 883–84 (3d Cir. 2022) (alterations in original) (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

[95] *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013) (emphasis added) (quoting *DeShaney*, 489 U.S. at 198), *as amended* (June 14, 2013).

[96] *Id.* (quoting *DeShaney*, 489 U.S. at 198).

[97] *Id.* at 171.

[98] ECF 65 ¶¶ 106–16. The Sisters do not advance all of their allegations against Chester County in its briefing on state-created danger. For example, the Sisters allege Chester County transmitted false information to the Commonwealth concerning reports of abuse to Malinda, *id.* ¶ 115 but do not tie this allegation to their arguments in opposing Chester County's Motion to dismiss.

[99] ECF 68-1 at 6–12.

[100] *Id.* at 12.

[101] ECF 74-2 at 8–14.

[102] *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2016).

[103] *Id.*

[104] *Doe v. Williamsport Area Sch. Dist.*, 699 F. Supp. 3d 306, 326 (M.D. Pa. 2023) (first citing *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); then citing *L.R.*, 836 F.3d at 244; and then citing *Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir. 1989)).

[105] ECF 68-1 at 8.

[106] *Id.* at 9.

[107] ECF 74-2 at 10.

[108] *Id.*

[109] ECF 65 ¶ 30.

[110] *Mears*, 24 F.4th at 885.

[111] *Kneipp*, 95 F.3d at 1209.

[112] *Id.* at 1201.

[113] *Id.* at 1202.

[114] *Id.*

[115] *Id.* at 1203.

[116] *Id.* at 1209.

[117] *Mears*, 24 F.4th at 883.

[118] *Id.*

[119] *Id.*

[120] *Id.* at 885.

[121] "To adequately plead foreseeability . . . we require a plaintiff to allege an awareness on the part of the state actors that rises to level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips v. County of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008). In this case, Chester County had awareness Mr. Hoagland and Ms. Warren were abusing Malinda. As just one example, Mr. Hoagland and Ms. Warren allegedly told the Defendants they did not feed Malinda breakfast. ECF 65 ¶ 78.

[122] "Although this inquiry is unavoidably fact specific for each individual case, a distinction exists between harm that occurs to an identifiable or discrete individual under the circumstances and harm that occurs to a 'random' individual with no connection to the harm-causing party." *Phillips*, 515 F.3d at 239 (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 909 (3d Cir. 1997)).

[123] "The level of culpability required for behavior to shock the conscience largely depends on the context in which the action takes place." *L.R.,* 836 F.3d at 2460. In situations (as here) "where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006). The Sisters plausibly allege Chester County actors were deliberately indifferent to Malinda's safety when they chose not to further investigate her living situation.

[124] ECF 65 ¶ 110.

[125] ECF 68-1 at 13.

[126] ECF 74-2 at 14–15.

[127] 212 F.3d 798, 808–09 (3d Cir. 2000).

[128] No. 11-1544, 2012 WL 1466433, at *4–*5 (M.D. Pa. Apr. 27, 2012).

[129] No. 07-768, 2007 WL 3010528, at *2 (E.D. Pa. Oct. 12, 2007).

[130] *See id.*

[131] ECF 65 ¶¶ 99–105. The Sisters do not advance all of its allegations against the School Districts in their briefing on state-created danger. For instance, the Sisters allege the School Districts sent inaccurate correspondence to Mr. Hoagland and Ms. Warren regarding Malinda's truancy, absences, medical documentation, and vaccination status, which rendered her more vulnerable to danger, *id.* ¶ 104, but do not address this allegation again.

[132] ECF 69-1 at 8–11; ECF 70 at 6–16.

[133] ECF 72-2 at 7–11; ECF 78-2 at 5–14.

[134] ECF 69-1 at 10; ECF 70 at 13–16. Coatesville School District also argues it did not engage in affirmative conduct by allegedly failing to correctly document Malinda's absences and by failing to notice when Malinda showed up to school hungry and bruised. ECF 69-1 at 10. But Coatesville disputes these allegations on their face; it points out it made at least two ChildLine reports. *Id.*

[135] *Id.*

[136] ECF 80 at 1–3.

[137] ECF 70 at 13–16. Upper Dublin School District focuses solely on the actions of Superintendent Yanni although the Sisters also sue Upper Dublin School District in its entirety.

[138] ECF 72-2 at 9–10; ECF 78-2 at 10, 12–13.

[139] The Sisters do not respond to Coatesville School District's argument it did not act affirmatively by failing to document Malinda's absences and/or failing to notice her bruised and malnourished condition. To the extent the Sisters intend to pursue a theory Coatesville School District violated Malinda's substantive due process rights by failing to document her absences and/or notice her condition (which is unclear from their response brief), this theory falls short of stating a constitutional claim. While "the line between action and inaction may not always be clear," *see Bright*, 443 F.3d at 282, we think both a failure to document and a failure to notice a student's condition fall in the "inaction" camp.

[140] 836 F.3d 235 (3d Cir. 2016).

[141] *Id.* at 239–40.

[142] *Id.* at 240.

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *Id.* at 242.

[147] *Id.* at 243.

[148] *Id.*

[149] *Id.*

[150] *Id.* at 244.

[151] *Id.* at 244, 247.

[152] *Id.* at 243.

[153] *See, e.g.*, ECF 65 ¶¶ 35–37, 42–43.

[154] *See, e.g., id.* ¶¶ 38–39, 59–60.

[155] *L.R.,* 836 F.3d at 243.

[156] Coatesville School District addresses the remaining elements very briefly, *see* ECF 69-1 at 10–11; Upper Dublin School District does not address the remaining elements at all.

[157] We agree with the Sisters it is irrelevant Malinda did not die until five months after Coatesville School District permitted Malinda to leave school with Ms. Warren because the Sisters plead Ms. Warren was abusing her the entire time she attended Coatesville schools.

[158] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 909 (3d Cir. 1997).

[159] ECF 72-2 at 9; ECF 78-2 at 12.

[160] *See L.R.*, 836 F.3d at 246 ("[T]he risk of harm in releasing a five-year-old child to an unidentified, unverified adult is 'so obvious' as to rise to the level of deliberate indifference.").

[161] Upper Dublin School District represents (and the Sisters did not today dispute) its "enrollment records identified Warren as Malinda's 'stepmother,' listed her as a 'parent/guardian,' and included her in Malinda's 'primary household.'" ECF 70 at 24. This maybe a question of fact which we would save for the jury if we found the Sisters stated a substantive due process claim against Upper Dublin (but we do not).

[162] ECF 65 ¶¶ 74, 81 (alleging employees of Coatesville School District made reports via ChildLine on or around November 7, 2023 and December 5, 2023). The Sisters do not allege who made the first report on June 1, 2023, *see id.* ¶¶ 62–63, but we can infer it was another employee of Coatesville School District given the reported information involved Malinda arriving ***at school***

with an abrasion on her face (and given Malinda was enrolled at Brandywine Middle School at that time).

[163] ECF 65 ¶ 35.

[164] But we note with respect to Superintendent Yanni the Sisters do not plausibly allege how the superintendent of the school would have known of Malinda's condition unless her teachers informed him—a fact the Sisters do not allege.

[165] *Bright*, 443 F.3d at 281 (first citing *Kneipp*, 95 F.3d at 1209 n.22; then citing *Morse*, 132 F.3d at 913).

[166] *See* ECF 65 ¶ 102; ECF 72-2 at 13–15; ECF 78-2 at 6–9.

[167] ECF 69-1 at 11. Coatesville seems to confuse the special relationship theory—an entirely separate theory of liability from the state-created danger theory—with one or more of the elements required under the state-created danger test.

[168] ECF 70 at 7–11.

[169] ECF 72-2 at 13; ECF 78-2 at 6.

[170] ECF 72-2 at 14–15; ECF 78-2 at 7–8.

[171] *Morrow*, 719 F.3d at 168 (emphasis added).

[172] *L.R.*, 836 F.3d at 247 n.57.

[173] *Id.* (emphasis added).

[174] We note one additional reason the special relationship exception does not apply as to Coatesville School District: "[t]he shocks-the-conscience test applies regardless of the theory upon which the substantive due process claim is premised." *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015) (collecting cases). As we explained above, the Sisters do not plead conscience-shocking conduct by Coatesville School District. Coatesville reported concerns about possible abuse to Malinda on two or three occasions. Maybe Coatesville should have reported earlier or more often. But its conduct did not rise to the level of deliberate indifference.

[175] *See Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978).

[176] ECF 65 ¶¶ 125–32.

[177] *Id.* ¶¶ 117–24.

[178] *Id.* ¶¶ 133–38.

---

[179] ECF 68-1 at 14.

[180] *Id.* at 16–17.

[181] ECF 69-1 at 13–14.

[182] ECF 70 at 17.

[183] ECF 72-2 at 16–18; ECF 74-2 at 16–17. The Sisters argue in their response to Chester County "the amended complaint explicitly refers to the following contacts and incidents forming the basis for plaintiffs' claims:" but stop after the colon and do not provide examples. ECF 74-2 at 17. The Sisters similarly stop in the middle of a sentence in their response to Coatesville. ECF 72-2 at 18.

[184] ECF 78-2 at 16.

[185] *Monell*, 436 U.S. at 691.

[186] *Hargrove v. City of Phila.*, 671 F. Supp. 3d 595, 605 (E.D. Pa. 2023) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[187] *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (alterations in original) (quoting *Monell*, 436 U.S. at 694).

[188] *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Harris,* 489 U.S. at 388).

[189] *Smith v. Phila. Dep't of Prisons*, No. 25-2448, 2025 WL 1907473, at *9 (E.D. Pa. July 10, 2025) (citing *Bridges v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016)).

[190] ECF 65 ¶¶ 139–47. We construe these claims together because "[t]here is no cause of action for recklessness under Pennsylvania law." *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 629 (E.D. Pa. 2015) (citing *Archibald v. Kemble*, 971 A.2d 513, 519 (Pa. Super. Ct. 2009)). "Rather, recklessness is a heightened standard of care required to potentially recover punitive damages." *Id.* (citing *Egan v. USI Mid–Atl., Inc.*, 92 A.3d 1, 18 (Pa. Super. Ct. 2014)).

[191] ECF 68-1 at 17–20; ECF 69-1 at 14–17; ECF 70 at 20–22.

[192] ECF 68-1 at 19; ECF 69-1 at 15.

[193] ECF 70 at 19–20.

[194] ECF 72-2 at 18–20; ECF 74-2 at 17–19; ECF 78-2 at 17–18.

[195] *Nace v. Pennridge Sch. Dist.*, 744 F. App'x 58, 67 (3d Cir. 2018); *see also* 42 Pa. Stat. and Consol. Stat. §§ 8541–64. We refer to the moving defendants as "state actors" throughout this Memorandum but we note for the purposes of the negligence claim the defendants are municipal employees.

46

[196] 42 PA. STAT. AND CONSOL. STAT. § 8541.

[197] *Sanford,* 456 F.3d at 315 (emphasis removed); *see also* 42 PA. STAT. AND CONSOL. STAT. § 8545.

[198] *See Sanford*, 456 F.3d at 315; *see also* 42 PA. STAT. AND CONSOL. STAT. § 8550.

[199] 42 PA. STAT. AND CONSOL. STAT. § 8542(a).

[200] *Id.* § 8542(b), (b)(9).

[201] The negligence claims may only proceed as to the alleged sexual abuse because sexual abuse is the only type of child abuse which can claw back immunity for municipal actors. Neither Chester County nor Coatesville School District disputes Malinda suffered sexual abuse. Conversely, Upper Dublin School District argues the Sisters do not plead Malinda suffered sexual abuse during her time at Upper Dublin. ECF 70 at 20–21.

[202] ECF 68-1 at 19 (emphasis added).

[203] *Id.*

[204] ECF 74-2 at 18.

[205] ECF 79 at 6–7.

[206] *Id.*

[207] 42 PA. STAT. AND CONSOL. STAT. § 8550.

[208] *Id.* §§ 8542(b)(3), (6), (7).

[209] *L.S. v. Hanover Area Sch. Dist.*, No. 22-234, 2024 WL 2393038, at *13 (M.D. Pa. May 23, 2024); *see also J.R. ex rel. Mr. R.R. v. Greater Latrobe Sch. Dist.*, 688 F. Supp. 3d 243, 259–60 (W.D. Pa. 2023)).

[210] *L.S.*, 2024 WL 2393038, at *13 (citing *J.R.*, 688 F. Supp. 3d at 259).

[211] ECF 68-1 at 19–20.

[212] 23 PA. STAT. AND CONSOL. STAT. § 6318(a). The General Assembly also grants immunity to officials and employees of county agencies who refer a report of suspected child abuse to law enforcement authorities. *Id.* § 6318(b).

[213] ECF 74-2 at 19.

[214] 23 PA. STAT. AND CONSOL. STAT. § 6318(a)(1).

47

---

[215] *Id.* § 6318(a)(2).

[216] We make no finding as to whether the Sisters adequately plead the four elements of common law negligence against Chester County.

[217] ECF 69-1 at 17.

[218] *Id.*

[219] ECF 72-2 at 19–20.

[220] *Harris v. Felouzis*, 331 A.3d 919, 925 (Pa. Super. Ct. 2025) (quoting *Minnich v. Yost*, 817 A.2d 538, 541 (Pa. Super. Ct 2003)).

[221] ECF 69-1 at 16.

[222] RESTATEMENT (SECOND) OF TORTS § 320 (A.L.I. 1965).

[223] *Id.* § 320 cmt. a.

[224] *Wartluft v. Milton Hershey Sch. & Sch. Tr.*, 844 F. App'x 499, 504 (3d Cir. 2021).

[225] *Id.* (citing *Watson v. PennDOT*, 33 Pa. D. & C.4th 325, 333 (Montgomery Cnty. Ct. C.P. 1996)).

[226] 23 PA. STAT. AND CONSOL. STAT. § 6311(a)(4).

[227] *Id.* § 6303(b.1).

[228] 744 F. App'x 58 (3d Cir. 2018).

[229] *Id.* at 60–62.

[230] The applicable provisions of the statute, sections 6352 and 6353, "were repealed on December 30, 2014 . . . ." *Id.* at 63 n.5.

[231] *Id.* at 64.

[232] *Id.* at 65.

[233] *Id.*

[234] *Id.* To the extent the Sisters argue Coatesville School District acted negligently by failing to report Malinda's absences under applicable truancy laws, the same reasoning applies; we decline to find a common law duty to report a student's absences based on a statute. Moreover, Coatesville is likely immune under the Tort Claims Act for failing to report Malinda's absences as the Sisters

do not plausibly allege the failure to report Malinda's absences from school caused her to be sexually abused.

[235] ECF 70 at 20–21.

[236] ECF 78-2 at 18.

[237] ECF 65 ¶ 111.

[238] *See id.* ¶ 140.

[239] *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

[240] *See White v. Dauphin County*, No. 22-1241, 2023 WL 6392735, at *10 (M.D. Pa. Sept. 29, 2023) ("[W]ithout an underlying tort, 'there can be no wrongful-death or survival action.'" (quoting *McCracken v. Fulton County*, No. 19-1063, 2020 WL 2767577, at *10 (M.D. Pa. May 28, 2020))).

[241] *See supra* Part II(D)(1).

[242] *Dubose*, 173 A.3d at 645 (quoting *Anthony v. Koppers Co., Inc.*, 436 A.2d 181, 185 (Pa. 1981)).

[243] *Fox v. Jeanes Hosp.*, No. 1471 EDA 2017, 2019 WL 168493, at *10 n.19 (Pa. Super. Ct. Jan. 11, 2019) (quoting *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 658 (Pa. Super. Ct. 2013)).

[244] *Valentino v. Phila. Triathlon, LLC*, 150 A.3d 483, 493 (Pa. Super. Ct. 2016) (emphasis added).

[245] Chester County does not argue any reason why we should dismiss the survival and wrongful death claims. But we still must address these claims given Chester County asks us to grant its Motion to dismiss in its entirety.

[246] *Quinby v. Plumsteadville Fam. Prac., Inc.*, 907 A.2d 1061, 1077 (Pa. 2006).